## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-42 (CRC)** |
| **JOSHUA LEE HERNANDEZ** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joshua Lee Hernandez to 30 months' incarceration, the top of the advisory Guidelines' range of 24-30 months, three years of supervised release, $2,000 in restitution, and the mandatory $200 special assessment.

### I.      INTRODUCTION

The defendant, Joshua Hernandez (hereinafter, "Hernandez"), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

Hernandez's conduct warrants a lengthy sentence of incarceration. He joined the mob on the West Terrace as he made his way to the Senate Wing Doors. He was one of the first rioters to breach the Capitol. Less than one minute after the first breach, Hernandez climbed through a window at the Senate Wing Door with fire alarms ringing and broken glass and overturned furniture on the ground. He then paraded throughout the Capitol for 40 minutes, including entry into the Speaker's Conference Room and Senate Gallery. On his way to the Speaker's Conference Room, he hit a door in the hallway with his flagpole and attempted to enter by turning the doorknob. This was feet from where Congressional staff were barricaded in an office, cowering in fear. Hernandez continued into the Rotunda. He pushed past police to the Memorial Doors where he coordinated a group-push with other rioters against police officers, forcing the Memorial Doors open. This allowed the rioters to come streaming into the Capitol. He then assaulted a police officer with his flagpole by hitting him in the helmet. That officer was than surrounded and attacked by the mob.

The government recommends that the Court sentence Hernandez to 30 months' incarceration for violating 18 U.S.C. §§ 111(a)(1) and 231(a)(3), which is at the top of the advisory Guidelines' range of 24-30 months, which the government submits is the correct Guidelines calculation. A 30-month sentence reflects the gravity of Hernandez's conduct, but also acknowledges his admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense filed in this

2

case, ECF 26, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.     Hernandez's Role in the January 6, 2021 Attack on the Capitol**

*Approach to the Capitol*

Hernandez participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos provided to the FBI by concerned citizens, body worn cameras from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the Capitol.

Hernandez traveled to Washington, D.C. from his home in Memphis, Tennessee to protest the results of the 2020 Presidential election. On January 6, 2021, Hernandez wore a red-bucket hat, blue shirt over a cream-colored hooded sweatshirt, and he carried an American flag affixed to a hollow plastic pole. Hernandez began his march to the Capitol at the Washington Monument.



*Hernandez (circled in red on left) at the Washington Monument and a close-up of his outfit*

Between 12:30 p.m. and 2 p.m., Hernandez marched with the mob from the Washington Monument onto the restricted grounds of the Capitol. At approximately 1:00 p.m., the mob pushed past police officers and barricades at the Peace Circle Monument on the western side of the Capitol. The mob then encountered another line of police officers on the western side of the Capitol by the inaugural stage. Hernandez was part of this initial mob that was temporarily held back by this line of police officers.



*Far (right) and zoomed (left) view of the mob on the western side of the Capitol.*

Hernandez and the mob then pushed past this line of police officers and made their way under the inaugural platform and up the stairs.

4

 

*Hernandez (circled in red on left) on top of stairs waiving a flag and under inaugural stage (left)*

Hernandez and the mob then moved up the stairs on to the Lower West Terrace near the Senate Wing Door. At 2:13 p.m., the first breach of the Capitol occurred when a rioter jumped through a broken window at the Senate Wing Door. Less than one minute after the first breach, Hernandez entered the Capitol through a broken window at the Senate Wing Door. As he landed, he stepped on broken glass as a loud fire alarm was going off.



*Hernandez (circled in red) climbing through the broken window (left) and landing (right)*

Hernandez then continued down the hallway into the Crypt.



*Hernandez in the Crypt with his flag (left) and holding his cellphone (right)*

Hernandez continued throughout the Capitol into the Hall of Columns, back from the House side of the first floor, and up a set of spiral stairs to the second floor of the Capitol and into the Rotunda. Hernandez, who began filming on his phone, then entered the Speaker's Hallway.



*Image from Hernandez's video (Exhibit 1)*

Hernandez's video shows him banging on a door with his flagpole and trying the handle to see if the room was open.[2] He entered an elevator as he yelled to other rioters, "Who's going to go up." At some point between the Crypt and the Speaker's Hallway, Hernandez procured a second flag that was affixed to a flagpole.



*Hernandez (circled in red) as he enters the elevator (Exhibit 1)*

Hernandez then entered the Speaker's Conference Room carrying his flag.

---

[2] The room Hernandez hit with his flag and attempted to open (Exhibit 1 at :35-:43) did not contain any Congressional staffers. However, Congressional employees were cowering in fear of the mob just feet from Hernandez in another room. The Speaker of the House, Nancy Pelosi, said after January 6, 2021, "I respect the speaker's office and the accoutrement of history that is there. But I'm more concerned about the damage that they did to our staff . . . That is damage. That is damage that must be addressed." (Exhibit 6 at 2)



*Hernandez (circled in red) in the Speaker's Conference Room*

Hernandez then continued back to the Rotunda. At approximately 2:35 p.m., Hernandez and the mob confronted officers who were securing a vestibule just off the Rotunda. Hernandez and the mob pushed past these police officers and into a vestibule. Hernandez was one of the first rioters who pushed through into the vestibule where the Memorial (also known as the East Rotunda) Doors, doors to the outside facing East towards the Library of Congress and the Supreme Court, were located.



*Hernandez (circled in red) moving toward the barricaded Memorial Doors (Exhibit 5)[3]*

The police officers, circled in yellow above, fell back to the Memorial Doors to keep the mob from opening them to the rioters massing outside the Capitol. Other rioters joined Hernandez at the Memorial Doors. As the mob formed around the police officers guarding the doors, Hernandez waived his hand and appeared to tell others to join the mob in a group push.

---

[3] To aid the Court, a table a table listing all government exhibits, various timestamps where Hernandez appears, and images from the videos circling Hernandez are attached. (Exhibit 7)



*Hernandez (circled in red) waving his arms to initiate a group push (Exhibit 5 at 1:15-1:30)*

       Hernandez and the mob then pushed against the police officers guarding the doors and forced the Memorial Doors open to the rioters outside of the Capitol. Hernandez then struck officer B.A. in the helmet with the flagpole.



*Hernandez (circled in red) reaches with his flagpole (circled in yellow) to hit Officer B.A.*

After Hernandez and others overwhelmed the officers inside the vestibule, the mob from outside the Capitol streamed into the building. Hernandez then moved up the staircase in the vestibule to the East Corridor, the site of a number of Senate offices.

11



*Hernandez (circled in red) parading with his flag down a Senate hallway*

Hernandez continued until he reached the hallway outside of the Senate Gallery at approximately 2:44 p.m. He then entered the Senate Gallery with his flag. Only twenty minutes earlier, the Vice President had been evacuated from the Senate Floor due to the mob's actions.



*At 2:26 p.m. the Vice President being evacuated (left). At 2:46 p.m., Hernandez parading (right).*

12

Minutes later, Hernandez left the Senate Gallery and proceeded down the hallway to the Ohio Clock Corridor near more Senate offices. At 2:52 p.m., Hernandez exited the Capitol through the Law Library Door.

### *Injuries*

Although Officer B.A., the assault victim in this case, reported that he did not suffer any physical injuries as a result of Hernandez's assault with the flagpole,[4] other rioters did cause injuries during Hernandez's Memorial Door push. Officer B.A. reported:

> When I noticed the Rotunda doors opening, I position myself in between the doors and wedged myself in the opening to prevent the rioters from breaching. Once I positioned myself, the rioters began to hit me in the head with their flagpoles. During this beating, a rioter tried to pull my helmet off my head where the chin strap choked me to the point where I lost consciousness . . . I had a left hand injury from using open hand techniques against the rioters and ultimately sustained weekly episodes of dizziness and headaches from being hit in the head by the rioters['] flagpoles.

While Hernandez did not personally assault Officer B.A. beyond striking him in the head with the flagpole, his participation in this riot aided those rioters who did succeed in injuring officers and destroying property. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attach") *supra.* Equally, his violent conduct incited and emboldened other violent rioters around him.

### III.    THE CHARGES AND PLEA AGREEMENT

On February 9, 2022, a federal grand jury returned an indictment charging Hernandez with nine counts, including violations of 18 U.S.C. §§ 111(a)(1) and 231(a)(3). On, November 2, 2022,

---

[4] Although Officer B.A. reported Hernandez's strike did not injury him, he did report "weekly episodes of dizziness and headaches [after January 6, 2021] from being hit in the head by rioters['] flagpoles."

Hernandez was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Hernandez now faces sentencing on 18 U.S.C. §§ 111(a)(1) and 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Hernandez faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $200.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

In their plea agreement, the government and Hernandez agreed upon the following proposed guidelines calculations:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base offense level | +14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | Total | 20 |

Count Three: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base offense level | +14 |
| U.S.S.G. § 2J1.2(b)(2) | Official victim | +6 |
| | Total | 20 |

ECF 25 at ¶ 5(A). Additionally, Hernandez and the government agreed to a three-point reduction for acceptance of responsibility. *Id.* The parties agreed the Estimated Offense Level was 17. *Id.*

On January 4, 2023, the Probation Office filed its presentence investigation report (ECF 30, hereinafter, "PSR"). Departing from the Guidelines calculations in the plea agreement, Probation added four points under U.S.S.G. § 2A2.2(b)(2)(B) to the offense level for the Section 111(a) offense for the use of a dangerous or deadly weapon. PSR ¶ 36. The government will abide by its plea agreement and recommends that the Court apply the stipulated Guidelines calculations that does not include this enhancement.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 47. Accordingly, based on the government's calculation of Hernandez's total adjusted offense level, after acceptance of responsibility, at 17,[5] Hernandez's Guidelines imprisonment range is 24 to 30 months' imprisonment. Hernandez's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Hernandez's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from

---

[5] Due to Probation adding in four points for dangerous or deadly weapon, their total offense level, after acceptance of responsibility, is 21. PSR at ¶ 36. Probation's guideline imprisonment range is 37 to 46 months. *Id.* at ¶ 82.

being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Hernandez's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 30 months' imprisonment.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Hernandez has no criminal history. ECF 42 at ¶ 24.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration. Hernandez's criminal conduct, encouraging the mob to push open the Memorial Doors, assaulting a police officer, and parading around the Capitol, including the Speaker's Conference Room and the Senate Gallery, was the epitome of disrespect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence of incarceration is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

16

***Specific Deterrence***

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Hernandez did not just witness violence, he personally perpetrated violence and encouraged others to follow suit. Hernandez paraded around the Capitol for over 40 minutes and went to many locations, including the Speaker's Conference Room and the Senate Gallery just 20 minutes after the Vice President was evacuated. He banged on and attempted to open a door in the Speaker's Hallway with Congressional staffers cowering just feet away. Additionally, Hernandez has to date not expressed remorse for what he did on January 6, only remorse that he is being held accountable. When interviewed by Probation about acceptance of responsibility, his only words were to agree with the conduct in the Statement of Offense. PSR at ¶ 28. A sentence of incarceration is warranted to underscore that his conduct was criminal, and to deter him from engaging in lawless conduct in the future.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by

17

professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.      **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and

balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Ricky C. Willden*, 21-cr-423 (RC), the defendant pled guilty to one charge of violating 18 U.S.C. § 111(a)(1). Willden bypassed barricades and police lines to make his way past police officers to the Memorial Doors, he joined the mob who surrounded police officers at the Memorial Doors and sprayed several officers with a chemical irritant, he continued into the Rotunda and remained there for 15 minutes, and he later celebrated his attack on police on Facebook. Gov. Sentencing Memo., *United States v. Ricky C. Willden*, 21-cr-423 (RC), ECF 38 at 1-2. The total offense level, after acceptance of responsibility, for Willden was 17. *Id.* at 23. The court sentenced Willden to a 24 months' incarceration. *Willden*, 21-cr-423 (RC), ECF 43-45.

Like Willden, Hernandez attacked the police officers securing the Memorial Doors at 2:35 p.m. Hernandez attacked them from the inside, encouraging rioters to group-push against the police officers, forcing the doors open. Once the doors were open and the police officers were surrounded and being attacked by the mob, Willden utilized a chemical spray to attack them from a distance. During this time Hernandez utilized a flagpole to attack the officers. Additionally, like Willden, Hernandez paraded through the Rotunda. However, Hernandez spent nearly three times as long inside the Capitol, he went to a number of locations, including the Speaker's Conference Room and the Senate Gallery, and he attempted to open doors in the Speaker's Hallway. Like Willden, the total offense level is 17. However, Hernandez faces an additional felony, 18 U.S.C. § 231(a)(3). Based on the similarities in where Willden and Hernandez attacked and Hernandez's additional aggravating circumstances, a sentence of 30 months' incarceration is warranted.

20

In *United States v. Howard Richardson*, 21-cr-721 (CKK), the defendant pled guilty to one charge of violating 18 U.S.C. § 111(a)(1). Richardson joined the storming of the police line on the West Terrace, he brought a metal flagpole with him to the Capitol which he used to strike a police officer three times, he helped a group of rioters with a large metal billboard to besiege officers. Gov. Sentencing Memo., *United States v. Howard Richardson*, 21-cr-721 (CKK), ECF 35 at 1-2. The government asked for 46 months' incarceration. *Id.* at 1. The court sentenced Richardson to a 46 months' incarceration. *United States v. Howard Richardson*, 21-cr-721 (CKK), ECF 35-39.

Like Richardson, Hernandez utilized a flagpole to assault a police officer who was attempting to hold back rioters. Richardson's case differs from Hernandez in two respects. First, the parties in Richardson agreed on the applicability of the dangerous or deadly weapon four-point enhancement. Here, the parties have agreed to not argue for that enhancement. Second, Hernandez's case is more aggravated. Richardson never entered the Capitol and pleaded to only one charge. Here, Hernandez was in the Capitol for almost 40 minutes, he paraded around a significant portion of the Capitol, including the Speaker's Conference Room and the Senate Gallery, and encouraged others to participate in a group push against a line of police officers. Although Hernandez does not face the four-point enhancement due to his use of the flagpole, he still utilized it to assault police officers who were protecting the Capitol. A lengthy sentence of incarceration, like Richardson, is warranted.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes."[8] *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer

B.A., did not suffer bodily injury as a result of Hernandez's assault. The parties agreed, as

permitted under 18 U.S.C. § 3663(a)(3), that Hernandez must pay $2,000 in restitution to the

Architect of the Capitol, which reflects in part the role Hernandez played in the riot on January 6.[9]

Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had

caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by

the Architect of the Capitol in mid-May 2021. *Id.* Hernandez's restitution payment must be made

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 113.

## VIII.   FINE

Hernandez's convictions under Sections 111 and 231 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

The government is not requesting a fine in this case.

IX.    **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 30 months' incarceration, the top of the advisory Guidelines' range of 24-30 months, three years of supervised release, $2,000 in restitution, and the mandatory $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:        */s/ Brian Brady*
Brian Brady
Trial Attorney, Department of Justice
DC Bar No. 1674360
1301 New York Ave. N.W., Suite 800
Washington, DC 20005
(202) 834-1916
Brian.Brady@usdoj.gov

24