### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLOMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CASE NO. 1:22-cr-42** |
| | **:** | |
| **JOSHUA HERNANDEZ,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

### DEFENDANT'S POSITION ON SENTENCING

Defendant Joshua Hernandez, through counsel, respectfully submits the following Position on Sentencing. Mr. Hernandez has received and reviewed the Presentence Investigation Report ("PSR") prepared in this matter. Both Mr. Hernandez and the Government object to the advisory guidelines calculation as it relates to the enhancement for a dangerous weapon on p. 9 of the Presentence Investigation Report.

Despite the seriousness of his crime, there are ample reasons for the Court to impose a below guidelines sentence in this matter. Based on the factors set forth below, Mr. Hernandez respectfully requests that the Court impose a sentence of six months of incarceration —a sentence that is "sufficient but not greater than necessary" to comply with the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).

### BACKGROUND

As we move further away from the events of January 6, 2021, it becomes more difficult to recall the fervor with which Donald Trump and his acolytes loudly and constantly proclaimed that a United States Presidential election was stolen from the rightful winner. Echoed by conservative media outlets with massive audiences, the false accusations of election tampering became fact in the minds of many of the 74 million Americans who cast their vote for the losing candidate. On

January 6, these voters turned out in the thousands to hear the President of the United States—
their President—urge them to march on the Capitol building to show their disapproval and
encourage their elected officials to reject the results. "We're going to walk down to the Capitol,
and we're going to cheer on our brave senators, and congressmen and women," Trump told his
supporters shortly before the Capitol assault. "We're probably not going to be cheering so much
for some of them because you'll never take back our country with weakness. You have to show
strength, and you have to be strong." Trump told them. And they listened.

        Joshua Hernandez became involved after being bombarded by conservative media outlets
propagating election fraud. The twenty-seven (27) year old was motivated to travel to Washington,
D.C. to attend the rally, because he thought that it would be exciting. Although he was a Donald
Trump supporter, he had no intention of committing assault or trespassing on and around the U.S.
Capitol when he and his girlfriend drove from Memphis, Tennessee to be a part of the action. He
did not attend Donald Trump's speech, but when he and his girlfriend heard a flash bang fire while
they were buying warmer clothes from a street vendor near the Capitol building, Mr. Hernandez
told his girlfriend, now wife, to hang back while he went to see what the commotion was all about.
At the time, neither of them could have imagined the eventual outcome.

        When Mr. Hernandez arrived at the scene of the U.S. Capitol on January 6, 2021, he saw
multiple people shoving each other. A woman dropped her Donald Trump flag on the ground, so
Mr. Hernandez picked it up for her. She told him that her hands were full, so he could have the
flag, which was attached to a PVC pipe. He continued to merge with the crowd when he was
sprayed with pepper spray by an officer stationed nearby. Frustrated by what he deemed an
unnecessary use of force against him, Mr. Hernandez joined the herd that entered the U.S. Capitol.
Once inside, Mr. Hernandez joined others who were intent on opening the rotunda door. After the

door was opened, Mr. Hernandez can be seen attempting to exit the building, only to be pushed back inside by the crowd.

It was during the opening of the Rotunda door that Mr. Hernandez made contact with the officer with the PVC flagpole. Video shows Mr. Hernandez reach out his PVC flagpole with one hand over several people and tap the officer's helmet – he does not strike him with force or cause any injury. Mr. Hernandez's intent was to communicate with the officer, who appeared to be struggling against the rotunda door, as he was surrounded by the mob on all sides.  After failing to exit the building out of the rotunda door due to the incoming crowd, he proceeded to follow others to a less crowded area upstairs.

Mr. Hernandez was not familiar with the layout of the U.S. Capitol and was following others inside the building while observing the chaos. He found himself inside the Senate gallery not because he intended to go there, but because he foolishly wandered where he should never have been. He was in the Senate gallery very briefly before exiting. Mr. Hernandez did not set out to join the often violent uprising on January 6, 2021. Like many others on that day, he was swept up in the excitement and emotion of the crowd and proceeded to make a series of poor decisions that have led him to his current position before this Court.

## I.       THE POST-*BOOKER* SENTENCING FRAMEWORK

Under Justice Breyer's majority opinion in *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. *See* 18 U.S.C. § 3553(a)(4)." *United States v. Booker*, 125 S.Ct. 738 (2005).  While holding  that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the remedial majority in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Pursuant to *Booker*, therefore, courts must

treat the Guidelines as one, among several, sentencing factor.

Pursuant to 18 U.S.C. §§ 3562 and 3553(a) – which were explicitly endorsed by the Supreme Court in *Booker* – sentencing courts should consider the need for the sentence imposed:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above. Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Pursuant to 18 U.S.C. § 3661, also expressly endorsed by the *Booker* majority:
No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Section 3582 of Title 18 states that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Taken together, the directives of *Booker*, as well as Sections 3553, 3661, and 3582 of Title 18, make it clear that sentencing courts may no longer consider the Guidelines alone in determining

the appropriate sentence.   After *Booker*, courts need not justify sentences outside the guideline range by citing factors that take the case outside the "heartland."  Rather, as long as the sentence imposed is reasonable and supported by the factors outlined in Section 3553, courts may exercise their discretion in individual cases and impose sentences which are not within the proposed guideline range.

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors.  *See Rita v. United States*, 127 S.Ct. 2456 (2007) and *Gall v. United States*, 128 S.Ct. 586 (2007).  A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Id.*  The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable.   *Id.*   By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure."  *Rita* at 2465.  It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court recently reemphasized, '[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.' *Gall* at 598 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

## II.   A SENTENCE OF 6 MONTHS OF INCARCERATION IS REASONABLE AND APPROPRIATE AND WARRANTED BY THE SECTION 3553 FACTORS AND BOTH PARTIES OBJECT TO THE FOUR-LEVEL "DANGEROUS WEAPON" GUIDELINE ENHANCEMENT.

Notwithstanding the plea agreement between the parties, the Guidelines are merely advisory, not mandatory. The 18 U.S.C. § 3553(a) factors support Mr. Hernandez's request that he be sentenced below the applicable guideline range.

The statutory penalties for convictions under 18 U.S.C § 231(a)(3) and 18 U.S.C. § 111(a)(1) are five years of imprisonment and a $250,000 fine and eight years of imprisonment and a $250,000 fine, respectively. The PSR calculates Mr. Hernandez's offense level as 21, with an advisory sentencing range of 37-46 months of incarceration. PSR ¶ 35-44. This calculation reflects a 4-level enhancement for "because a dangerous weapon (a flagpole) was used." PSR ¶ 36. When reaching the plea agreement in this matter, however, the parties affirmatively rejected the application of the "dangerous weapon" enhancement and both Mr. Hernandez and the government timely filed their written objections to its application.

The PVC flagpole used by Mr. Hernandez to lightly strike the top of the officer's riot helmet is not a "dangerous weapon" as contemplated by USSG §2A2.2(b)(2)(B). While the Guidelines do not define what constitutes a "dangerous weapon," courts have previously explored the issue, most commonly in determining whether it applies under 18 U.S.C. § 111(b). A deadly or "dangerous weapon" is "any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person." United States v. Bullock, 970 F.3d 210, 215 (3d Cir. 2020).

"A defendant who acts `forcibly' using a deadly or dangerous weapon under § 111(b) must have used force by making physical contact with the federal employee, or at least threatened the employee, with an object that, *as used*, is capable of causing great bodily harm."

United States v. Taylor, 848 F.3d 476, 494 (1st Cir. 2017) (emphasis added).

The PVC flagpole carried by Mr. Hernandez is not a dangerous weapon in this context. First, it is a thin plastic rod, that appears to have little weight. It is not inherently dangerous. As used by Mr. Hernandez, it offered no physical danger to the officer. In video of the incident, Mr. Hernandez appears to reach over two individuals while holding the pole with one hand, and barely make contact with the officer's riot helmet—two quick taps with little impact. In no way did the usage approach capability "of causing great bodily harm," and the enhancement here is not warranted by the facts.

In United States v. Duke Wilson, 1:21-cr-00345-RCL, another matter arising from the January 6, 2021, riot, the parties, probation, and the court declined to apply the "dangerous weapon" enhancement where the defendant plead under 18 U.S.C. § 111(a)(1). In that matter, Mr. Wilson used a several feet long PVC pipe to strike police officers before throwing it and striking another. (Government's Sentencing Memorandum at p. 12.). The matter of use in that case is arguably more forceful and dangerous than Mr. Hernandez's. Applying the enhancement here and not there, would be an unjust discrepancy, and we urge the Court to reject it.

**A.** **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

In accordance with 18 U.S.C. 3553(a)(1), courts are to consider "the nature and circumstances of the offense and the history and characteristics of the defendant," when imposing an appropriate sentence. These factors indicate that a sentence of six month's incarceration is sufficient in this case.

*1.       Mr. Hernandez's History, Background and Character*

Mr. Hernandez's history, background, and character are marked by childhood trauma and

adversity. Mr. Hernandez was primarily raised by his maternal grandparents until they passed away when he was fifteen (15) years old. PSR ¶ 55. After his maternal grandparents passed away, Mr. Hernandez was forced to make his own way as a teenager. *Id.* He never had a relationship with his father and while his mother would come stay with him and his grandparents from time to time, she was primarily absent from his life. She tragically died from a fentanyl overdose in 2022. PSR ¶ 54. Mr. Hernandez also experienced abuse by family members as a young child that he has only recently begun to work through emotionally. PSR ¶ 58. Further, Mr. Hernandez himself struggled with abuse and addiction at a young age as he watched his mother come in and out of his life with her own addiction problems. PSR ¶ 67

Despite not beginning life with a strong foundation, Mr. Hernandez now has a family of his own and is determined to provide a stable life for his family. He is married to Letty Hernandez, formerly Letty Morales. Since the events in this case, Mr. Hernandez got married and became a father to a boy and a girl, both under two years old. PSR ¶ 59. Their birth has given Mr. Hernandez a new perspective on priorities as he works to support his family and give his children a better life childhood than he experienced. His wife stays at home with the babies while Mr. Hernandez works at Active Wireless to support the family. Mrs. Hernandez describes her husband as "loving and devoted" to her and their children. She admires how he has "worked tirelessly" to support them after he overcame addiction issues and truly turned his life around before the birth of their children. Mrs. Hernandez supports her husband as he continues to pursue self-improvement, and she asks the court to impose a lenient sentence on her husband. She is terrified of how the family will get along during his absence.

Mr. Hernandez's brother, Orlando Hernandez, wants the Court to know that the birth of his niece and nephew, Mr. Hernandez's children, has made a huge impact on his brother's life.

Orlando describes how his brother used to exhibit ignorant views and a lack of patience but has transformed into a "happy and loving father." Orlando wants the court to know that despite there being a pattern of addiction in their lives growing up, Mr. Hernandez has shown a true commitment to recovery, and the love that he has for his children has been a "powerful motivator" for Orlando's own path to recovery. He hopes that the Court will give Mr. Hernandez a lenient sentence that will allow him to continue providing for his family, because Mr. Hernandez is capable of change – he has shown this through his transformation from a young man suffering from addiction into a loving husband and father.

Mr. Hernandez's supervisor, Moe Mohammed from Active Wireless, wants the Court to know that Mr. Hernandez is a valuable member of their team. His rapport with customers is great, and his absence would be a huge loss for the company. Mr. Hernandez has a "strong work ethic", a "positive attitude", and consistently acts as a "team player." His absence from their team would be a true loss.

It is difficult to reconcile Mr. Hernandez's participation in the January 6 riot with the positive impact he has had on his family and community, and it is tempting to define him by his worst, rather than his best acts. Indeed, the impact of his crime and his lifelong felon status will largely shape his future. Mr. Hernandez is cognizant of this fact and accepts it. Nevertheless, a below-the-guidelines sentence will allow Mr. Hernandez to continue picking up the pieces of his life and move forward as a good citizen and father. Despite his crime, Mr. Hernandez is worthy of that opportunity.

2.      *The Nature and Circumstances of Mr. Hernandez's Role in the Offense*

Mr. Hernandez has acknowledged guilt and accepted responsibility before this Court. His criminal conduct is concisely described in the statement of facts and in the Presentence

Investigation Report. PSR ¶ 18-24. Mr. Hernandez does not dispute the statement of facts, and most, if not all of Mr. Hernandez's actions, are captured by surveillance or other video. In fact, the video captures more than the statement of facts include. The video of Mr. Hernandez at the rotunda door shows him participating in the efforts to get the door open. This same video, however, shows an elderly man being knocked to the ground in front of the door as people rush inside, his hat flying. It shows Mr. Hernandez help the man to his feet, pick up his hat, and place the hat back on the man's head. It is this moment that captures Mr. Hernandez's true character— his humanity. His participation in the riots was an anomaly—a temporary, but egregious loss of good sense and judgment that in no way reflects his personality.

Mr. Hernandez did not intend to enter the Senate chamber and disrupt the proceedings. He originally intended to exit the Capitol through the rotunda doors after they were opened, and his attempt to do so is captured by video. The mass of people swarming in, however, prevented Mr. Hernandez's departure, as he tried to push his way out the door. In his subsequent wanderings through the Capitol searching for an exit, he walked through the Senate wing of the building, including the Senate chamber. He made no contact with any other officers during that time and exited the building 12 minutes after he left the Rotunda. (Statement of Offense p. 12). He had no plan, no agenda, or vile intent. Nevertheless, Mr. Hernandez recognizes his culpability and acknowledges his guilt before this Court.

### B.    The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant.

One of the most puzzling aspects of the January 6 riot is that it brought together mostly ordinary, previously law-abiding citizens, who temporarily lost all reason and self-control. While some of the riot participants were members of various groups who arrived in D.C. with plans to

cause criminal mischief, many more, like Mr. Hernandez, came to the city with no nefarious intentions. January 6 was a singular event with few precedents by which to guide the Court. As such, the normal calculations of deterrence and community protection do not necessarily apply in the same manner as other criminal sentencings. Nevertheless, the Court is tasked with fashioning a sentence that deters others from engaging in future rioting and protects future potential victims from Mr. Hernandez. A sentence of six months of incarceration is sufficient to accomplish these goals.

### 1. Deterrence

Mr. Hernandez is now a convicted felon and faces separation from his wife and young children during their most formative years. Mr. Hernandez will also be prohibited from exercising his right to vote—a right he cherished so deeply, it led him to where he is today before this Court. While a sentence below the guidelines may not deter those predisposed to political violence, Mr. Hernandez is not in that group, and the distinction is significant. The court has already handed down significant jail time to those who directly engaged in violence against law enforcement officers or who conspired to lead the January 6 mob. But for those, like Mr. Hernandez, who chose to attend a rally to be a part of the action in protesting perceived voting irregularities, a federal felony conviction is more than adequate to prevent future protesters from crossing the line into illegal activity. For the non-violent, a conviction and any jail sentence, will deter future similar conduct.

### 2. Protecting the Public

Regardless of the sentence imposed by the Court, there is little reason to believe that Mr. Hernandez is a future threat to the public. The circumstances that led Mr. Hernandez to enter the U.S. Capitol on January 6th were unique to that place and time. Like many others, Mr. Hernandez

was swept up in the momentum of an angry mob, many of whom believed they were acting patriotically by protesting a corrupted presidential election. While Mr. Hernandez, at the time, may have believed he was on the side of God and Country, hindsight has since disabused him of that notion. With the perspective offered by the passage of almost two years, Mr. Hernandez recognizes the magnitude of his error and greatly regrets his involvement. Moreover, the price he has already paid for his transgression is too great for him to repeat the mistake. Based on the unlikeliness of Mr. Hernandez reoffending, a below guidelines sentence would be a sufficient sentence that is not "greater than necessary."

### C. <u>The Need to Avoid Unwarranted Sentencing Disparities.</u>

In fashioning an appropriate sentence, sentencing courts are to consider "the need to avoid unwarranted sentencing disparities among defendants of similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The focus of this analysis will be the most serious offense for which Mr. Hernandez is pleading guilty: 18 U.S.C. § 111(a)(1)[1]. Of this group, Mr. Hernandez's conduct falls on the less extreme end of the spectrum. The most comparable 111(a)(1) cases are *United States v. Mark Leffingwell*, *21-cr-5* and *United States v. Kevin Creek*, *21-cr-645,* who received sentences of six (6) months and 27 months, respectively. Like Mr. Hernandez, both defendants had guidelines of 24-30 months.[2]

Kevin Creek, who received 27 months, showed up for the rally fully prepared with mace, a boot knife, and binoculars. *Government's Sentencing Memorandum*, ECF no. 48, p. 12/37. Further, Creek was one of the initial people to break through the barrier of bike-rack fencing. *Id.*

---

[1] The range of sentences for a violation of 18 U.S.C. § 231(a)(3) alone is 30 days to 18 months. Undersigned counsel could not locate a defendant who had been sentenced under 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 111(a)(1) without having also been convicted of other charges.

[2] As stated above, we believe that 23-30 months is the appropriate guideline range, based on the inapplicability of the 4-level "dangerous weapon" enhancement.

at p. 13. Creek then forcefully drove a Metropolitan Police Dept. Officer backward through the West Plaza just before hitting him in the face shield of his helmet. *Id.* at p. 13-14. Creek then assaulted a second police officer by shoving and kicking him to the ground. *Id.* at p. 16. Creek then confessed his crime to a medical doctor, who reported that Creek "was not ashamed about participating in the events." *Id.* at p. 19. Finally, and in contrast to Mr. Hernandez, Creek did not express remorse and told the FBI that he was "50/50" with whether we regretted his conduct. *Id.* Thus, Creek's involvement is substantially more serious than that of Mr. Hernandez.

Like Creek, Leffingwell also assaulted two police officers by hitting them in the head after he encouraged rioters not to back up. *Government's Sentencing Memorandum*, ECF no. 31 p. 2, 8. Like Creek, Leffingwell was a former marine. Leffingwell was apprehended as he made his way towards the Senate Wing. *Id.* at p. 7. In recommending a 27-month sentence, the government acknowledged his "early admission of guilt, the significant injuries he sustained while serving our country, and lack of criminal history." *Id.*

Mr. Hernandez's conduct is not as egregious as Leffingwell or Creek, because their conduct involved assaulting more than one officer. Further, Mr. Hernandez's contact with the officer was a non-forceful tapping on the helmet with a PVC pipe as opposed to the outright punches committed by Creek and Leffingwell. Though Mr. Hernandez made his way into the Senate gallery, he did so because he followed the crowd there, not because he was actively seeking to locate and enter it.

Thus, a sentence of six months of incarceration would not represent a sentencing disparity where Leffingwell received six months after assaulting two police officers and Creek received 27 months after assaulting two police officers and expressing no remorse.

## **CONCLUSION**

For the reasons discussed above, a sentence of six months is reasonable and appropriate. Such a sentence sufficiently addresses Mr. Hernandez's conduct as well as other factors pursuant to 18 U.S.C. § 3553(a).   Based on Mr. Hernandez's role in the offense, his life history, and contributions to the lives of his friends and family, a sentence within the guidelines would be more than is sufficient to deter similar conduct and protect the public.   Accordingly, Mr. Hernandez respectfully requests that the Court impose a sentence of six months of incarceration to be followed by a period of supervised release.

Respectfully Submitted,

SCROFANO LAW PC

BY:

_____/s/_____
Jay P. Mykytiuk [Bar No: 73592]
*Counsel for Joshua Hernandez*
600 F Street NW, Ste 300
Washington, DC 20004
jpm@scrofanolaw.com
Ph: 202-630-1522

_____/s/_____
Morgan E. Leigh [Bar No: 1011440]
*Counsel for Joshua Hernandez*
600 F Street NW, Ste 300
Washington, DC 20004
mel@scrofanolaw.com
Ph: 301-916-4226

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of January 2023, I filed the foregoing with the Clerk of the United States District Court for the District of Columbia by using the CM/ECF system, which system I understand has provided electronic notice counsel of record.

/s/ Jay P. Mykytiuk
Jay P. Mykytiuk